**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ARIANA GOSWICK,<br><br>*Plaintiff*,<br><br>-against-<br><br>AURA HEALTHCARE, LLC d/b/a MOUNTAINSIDE TREATMENT CENTER and ARTEMIS PARTNERS, LLC,<br><br>*Defendant*. | **Case No.:26-cv-9274**<br><br>**COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiff Ariana Goswick ("Plaintiff" or "Ms. Goswick") by and through her attorneys, Elefterakis, Elefterakis & Panek, as and for her complaint against Aura Healthcare, LLC d/b/a Mountainside Treatment Center ("Mountainside and/or Defendant") and Artemis Partners, LLC ("Artemis"), collectively hereinafter "Defendants," respectfully alleges as follows:

## PRELIMINARY STATEMENT

1. Mountainside is a substance use disorder and mental health treatment center financed and influenced by the investment firm Artemis Partners, LLC ("Artemis"), which, as a group, prioritizes profits over treatment and recovery for its vulnerable patients. Specifically, Mountainside prioritizes financial incentives for specific treatments and makes decisions based on maximizing profit at the expense of appropriate patient care. As shown in this case, if anyone opposes Mountainside's tactics and/or expresses concerns about the negative effects on patient health, they are terminated in clear retaliation.

2. Ms. Goswick, a Licensed Mental Health Counselor (LMHC) and Licensed Professional Counselor (LPC), observed these tactics firsthand, lodged formal complaints, and was terminated in clear case of retaliation for raising valid patient care concerns of what she believed to be

unethical and criminal behavior.

3. As soon as Ms. Goswick raised concerns about her reasonable belief of unethical or illegal practices, Mountainside punitively retaliated and terminated her employment.

4. This action seeks redress and compensation for this unlawful conduct.

**PARTIES**

5. At all times material, Plaintiff was and is a resident of the State of New Jersey.

6. At all times material, Plaintiff was and is a "person" and an "employee" of Defendants and is entitled to protections as defined by the New York Labor Law ("NYLL").

7. At all times material, Aura Healthcare, LLC d/b/a Mountainside Treatment Center, ("Mountainside" or "Defendant") is headquartered at 187 S Canaan Road, Canaan, Connecticut 06018.

8. At all times material, Artemis Partners, LLC is located at 243 West 18th Street, New York, New York 10011.

9. At all times material, Plaintiff worked from Defendant's New York City office located at 243 West 18th Street, New York, New York 10011.

10. Upon information and belief, Artemis Partners LLC does business as Mountainside Treatment Center.

11. At all times material, Plaintiff was employed by Defendant.

12. At all times material, Defendant was and is an "employer" under the NYLL.

13. At all times material, Defendant employed over 50 employees.

## NATURE OF THE CASE

14. This is a civil action based upon Defendants' violations of Plaintiff's rights guaranteed to her by the New York Labor Law, *as amended*, §§ 740 and 741 ("NYLL"), New York Mental Hygiene Law § 32.06 ("MHL"), and New York Education Law § 6530 (19).

15. Plaintiff seeks redress for the injuries she has suffered as a result of Defendants' retaliation based on her reasonable belief and valid concerns that Mountainside was violating public health and safety protocols.

## JURISDICTION AND VENUE

16. This Court has jurisdiction over the claims herein under 28 U.S.C. §1332, based on diversity jurisdiction, as this matter involves parties who are residents of different states (New Jersey, Connecticut, and New York), and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

17. The Court has supplemental jurisdiction over Plaintiff's state claims pursuant to 28 U.S.C. § 1367.

18. Venue is proper in the Southern District of New York pursuant to 29 U.S.C. §1391 (b)(2) because the events giving rise to Plaintiff's claims occurred within the Southern District of New York.

## FACTUAL ALLEGATIONS

### Plaintiff Joins Mountainside and Comes Under Eric Gottlieb's Supervision

19. Plaintiff was hired on April 17, 2023, as a "Clinician III" with an annual salary of $105,000. Initially, Plaintiff reported to Courtney Hulse, who served as Regional Manager and was subsequently promoted to Director of Outpatient Services in early 2024 (hereinafter, "Director Hulse").

20. In August 2023, Eric Gottlieb ("Supervisor Gottlieb") was hired as a Program Manager of the New York City Outpatient center and became Plaintiff's direct supervisor.

21. Plaintiff's tenure at Mountainside initially went smoothly and she quickly became a valuable member of the team. Due to her excellent performance, which garnered consistent praise from coworkers and patients, Plaintiff received positive performance evaluations, leading Management to offer her two promotions: the first in May 2024 and the second in July 2024.

22. While Plaintiff dedicated herself to patient care, prioritizing clinical need and building trust to support patients in their sobriety, it became increasingly apparent that the investment firm, Artemis, and patient care facility, Mountainside, were jointly engaging in practices that undermined the integrity of clinical decision making and, in turn, compromised the quality of care. Ultimately, Plaintiff recognized a growing disconnect in patient care, which led her to reluctantly decline the promotions offered.

23. Indeed, Plaintiff remained in good standing and only experienced employment-related issues after she raised concerns regarding patient care practices and rejected a second promotion. Thereafter, Defendant's treatment of Plaintiff changed materially and adversely.

24. Plaintiff made complaints upon realizing that Mountainside's clinical care decisions were driven by profit considerations at the expense of patient care.

25. Of particular concern was the lack of organizational separation, as employees of Artemis simultaneously held positions within Mountainside, resulting in overlapping job responsibilities, divided supervisory decisions, and confusion regarding lines of accountability among Mountainside's staff and patients.

26. Instead of focusing on treatment, Mountainside, in conjunction and driven with financial backer, Artemis, implemented private-equity-style business practices in its patient centers. At the

centers, Management frequently undermined Clinicians' treatment decisions in pursuit of profit. It was Plaintiff's reasonable belief that this created an unethical, dysfunctional environment that was noncompliant with sound patient care and governing regulations.

27. On or around late 2023 and early 2024, Nicole Barman, a Clinician ("Clinician Barman"), requested peer supervision with Plaintiff regarding Clinician Barman's clinical recommendations to refer her patient from Intensive Outpatient Program ("IOP") to a higher level of care. During this peer supervision meeting, Clinician Barman informed Plaintiff that her decision had been previously supported by Supervisor Gottlieb; however, Mountainside leadership and Recovery Coach, Rich Lobel ("Lobel"), improperly interfered with her professional judgment. Due to the patient's perpetual state of relapses and excessive absences from IOP, Clinician Barman appropriately referred the patient to Residential Treatment ("RT"), a higher level of care.

28. Clinician Barman stated to Plaintiff that Lobel escalated the matter to senior management, who interfered with the clinically indicated treatment recommendation and deferred to the patient's preference rather than medical and clinical necessity. Lobel, who lacked clinical authority, persuaded leadership to keep the patient in IOP, undermining Clinician Barman's clinical determination. This interference, implemented by Supervisor Gottlieb, compromised patient care as it disregarded clinicians' authority to exercise clinical duties and professional discretion, as this particular patient was of substantial financial means.

29. Mountainside's failure to uphold its clinicians' determinations, coupled with its tolerance of unethical negotiations aimed at preserving social capital, seemingly incentivized the retention of patients in lower-level, billable services. These services were more likely to be well received by patients who would otherwise threaten to discontinue services if they could not remain in IOP, thereby increasing referrals that required sustained admissions and ongoing revenue.

30. This practice had become common knowledge among patients, including those appropriately and clinically referred from IOP to the higher level of care of Residential Treatment ("RT) based on the clinical team's agreed-upon criteria concerning absences and relapses warranting escalation of care. As a result, patients became aware that these clinical standards were not being applied uniformly.

31. As such, Plaintiff's patient, who had previously been appropriately referred to Residential Treatment due to numerous relapses and absences, repeatedly expressed frustration regarding the disparate treatment afforded to another patient ("Patient A") in the same IOP group and Mountainside's failure to apply uniform, clinically indicated standards of care.

32. While Plaintiff's patient was held to clinical standards and referred to a higher level of care, Patient A, who had significant social and financial influence, was permitted to remain in IOP despite exhibiting conduct that would warrant Residential Treatment in direct violation of clinical guidelines. This inconsistent application of clinical criteria reflected a pattern of compromised patient care influenced by financial and revenue-driven considerations, to the detriment of patient safety.

**Supervisor Gottlieb Attempts to Coerce Plaintiff into Falsifying Documents for Audit**

33. On June 18, 2024, Supervisor Gottlieb presented Plaintiff with a stack of forms requesting her signature a mere ten minutes before a team meeting. Plaintiff had never previously seen these forms. Upon further review of the documents, Plaintiff discovered the forms purported to memorialize biweekly clinical supervision meetings between Supervisor Gottlieb and Plaintiff over the preceding eight months. However, these specific meetings never occurred.

34. The forms contained detailed dates, patient names, and treatment information, falsely creating the appearance of contemporaneous supervision and regulatory compliance required

under Office of Addiction Services and Supports ("OASAS") standards. The forms also included Supervisor Gottlieb's back-dated signature and a blank space designated for Plaintiff's back-dated signature, evidencing the deliberate fabrication of documentation to memorialize nonexistent supervision meetings.

35. Supervisor Gottlieb instructed Plaintiff to sign the forms, despite knowing that the purported supervision meetings never occurred and that Plaintiff did not participate in them. He emphasized the need to satisfy the requirements of an upcoming OASAS audit and expressed concern that Plaintiff 's refusal to sign could result in his termination.

36. Despite his pressure tactics, Plaintiff declined to execute the false records.

37. The following day, when pressed once again to sign and falsify the documents required by OASAS, Plaintiff reaffirmed to Supervisor Gottlieb that she would not sign the forms.

38. Supervisor Gottlieb insisted that he prepared these documents in preparation for the OASAS audit and created the same documents for his entire team, stating that she should comply simply because others would. He further stated that he had used this technique in his previous place of employment and brought the same "bad habits" to Mountainside.

39. Despite his explanation, Plaintiff voiced her opposition and refused to participate in the illegal and unethical practice of falsifying documents.

40. Ms. Goswick then attempted to dissuade Supervisor Gottlieb from proceeding with the falsification of documents and encouraged him to inform Director Hulse in advance that the purported supervision meetings had not taken place, to which he initially agreed and stated, "I am glad you didn't agree to falsify documents with me."

41. However, upon information and belief, Supervisor Gottlieb ultimately followed through with the falsification.

**Plaintiff Engages in Protected Activity at Mountainside as she Repeatedly Voices Concerns about Patient and Clinical Care**

42. Throughout her tenure and especially after this unlawful encounter with Supervisor Gottlieb, Plaintiff made her complaints known.

43. Plaintiff complained to Supervisor Gottlieb about concerns with the treatment of patients and the management of staff. Despite his duty to report her complaints, Supervisor Gottlieb instead instructed Plaintiff to reach out to Mountainside leadership directly with her concerns.

44. On June 24, 2024, Plaintiff met with Mountainside leadership, specifically, Dave Matteini, Director of Mountainside ("Director Matteini"), Andre Basso, CEO of Mountainside ("CEO Basso"), and Jerica Adorno, Director of Team Development for Artemis ("Artemis Director Adorno"), to further advance her complaints of unethical and unlawful actions.

45. To prepare for this meeting, Plaintiff created a comprehensive presentation titled "***MTC Outpatient Restructuring***" that outlined her complaints surrounding patient and clinical care practices at Mountainside and proposed strategies to restructure outpatient programming for long-term success in hopes that the concerns regarding patient care would be corrected.




46. This good-faith complaint covered issues such as facility and curriculum improvements,

understaffing, safety concerns, compliance with OASAS regulation, and, most critically, admissions and level of care decisions based on profit-making at the expense of patient care.

47. CEO Basso initially acknowledged Plaintiff's "bravery" in raising her concerns. In stark contrast, Supervisor Gottlieb reacted with clear displeasure that Plaintiff voiced concerns to leadership, despite having expressly instructed Plaintiff to do so. He stated in a subsequent conversation, "I should be the one bringing these ideas to them." Plaintiff firmly reminded Supervisor Gottlieb that she had raised these concerns with him for nearly a year, during which no changes had occurred, and that he had specifically instructed her to take her concerns to Director Matteini.

48. Supervisor Gottlieb's conduct was a deliberate reversal of his prior directive, knowingly contradicting the instruction he had given Plaintiff and faulting her for following it.

49. Initially, Mountainside appeared to show genuine interest in making improvements, even asking Plaintiff to create a comprehensive position to "raise the clinical bar." However, despite this posturing and giving recommendations, no actual changes were made.

50. Following her refusal to sign falsified documents and meetings with leadership in June, Supervisor Gottlieb became increasingly erratic toward Plaintiff and his staff, which led Plaintiff to make an additional formal complaint to Lauren Killawee ("HR Killawee") of HR.

51. During this time period, Plaintiff continued to witness instances of Supervisor Gottlieb prioritizing the census[1] over the clinical needs of patients. Following Mountainside's lead, Supervisor Gottlieb improperly allowed patients to remain in IOP despite relapsing and no longer meeting the criteria for that level of care, when they instead required Residential Treatment.

[1] Census refers to the number of patients at the facility.

52. In July 2024, during a team meeting, a Clinician raised concerns regarding an arrangement involving a patient receiving services through a different program within Mountainside while simultaneously given access to certain services at the New York City facility location. The team expressed concern that the arrangement had not been adequately communicated to staff, resulting in a lack of oversight regarding the patient's drug testing and uncertainty about which Clinician was responsible for communication and monitoring.

53. Supervisor Gottlieb initially had limited awareness that this arrangement had occurred. However, once he became aware, he had a duty to address it or report it to Management. Instead, he failed to take action, neglecting his supervisory responsibilities, and merely stated, "I need to talk to Courtney (Director Hulse)."

54. Plaintiff expressed her frustration that Supervisor Gottlieb, despite his clinical leadership role, repeatedly avoided making clinical decisions and instead deferred to Director Hulse. Plaintiff noted that this was not clinically appropriate and that it compromised the quality of patient care.

55. The following day, Supervisor Gottlieb told Plaintiff that he believed the manner in which she raised her concerns was inappropriate and he would have preferred the complaints to be communicated differently. Plaintiff disagreed and asked how he wished to proceed. Supervisor Gottlieb stated he did not know and continued to criticize her for making complaints. Plaintiff communicated to Supervisor Gottlieb that, without his direction on how to move forward, it'd be best to escalate the matter to HR.

56. Plaintiff filed a complaint with HR on August 2, 2024, and spoke at length with HR Killawee, regarding Supervisor Gottlieb's attempt to manipulate Plaintiff into falsifying records for OASAS compliance, as well as his criticism of her protected complaints of patient care and clinical decisions. Plaintiff further documented and sent the MTC Outpatient Restructuring

PowerPoint presentation, slides previously sent to Director Matteini, CEO Basso, and Artemis Director Adorno. The complaint included the following concerns:

A) Allowing Recovery Coaching clients, who are not required to maintain sobriety and are not part of the OASAS clinical program, to regularly enter the specific OASAS Outpatient clinical unit in the evenings to use the restroom facilities, thereby violating HIPAA and OASAS regulations;

B) Failing to implement adequate administrative, technical, and physical safeguards to protect patient information in violation of the Health Insurance Portability and Accountability Act ("HIPAA") regulations;

C) Prioritizing the maintenance of high patient numbers (referred to as "census") at the expense of providing appropriate clinical care; and

D) Failing to provide adequate security personnel and security cameras, creating safety risks for staff and patients, particularly during evening group sessions led by female staff without front desk or security presence.

57. HR Killawee informed Plaintiff that HR would commence an investigation into the concerns she raised.

58. However, after Plaintiff's complaint, Mountainside, in willful disregard of safety concerns and in violation of its obligations under HIPAA, left the front desk unstaffed following the departure of the assigned administrative assistants, failing to implement any measures to maintain security or patient confidentiality.

59. Specifically, Clinicians were directed to cover the front desk and were expected to simultaneously complete their administrative work, disregarding the potential HIPAA risks of exposing sensitive patient information to public view.

60. A few days later, Plaintiff spoke with Recovery Coach, Damien Reilly ("Reilly") and shared her concerns regarding a culture of fear and financially driven level of care decisions. Reilly similarly expressed concerns that his bonuses and promotions were contingent upon referrals to certain clinical and Recovery Coaching services.

61. Reilly clarified that he opposed this practice, believing referral decisions should be based solely on patient need rather than financial incentives or career advancement. He further stated that he made referrals based on clinical necessity despite knowing that his refusal to refer jeopardized his bonuses, promotions, and employment.

62. Plaintiff informed Reilly that she again intended to speak with Director Matteini about the culture of fear within Mountainside, the importance of relying on clinical judgment in treatment decisions, and her reasonable belief that certain organizational practices prioritized business considerations at the expense of patient care. In response, Reilly asked whether they should exchange private phone numbers and expressed concern that Plaintiff could be terminated for speaking up about these issues.

63. On August 5, 2024, with her complaints still left unaddressed, Plaintiff again met with Director Matteini and Artemis Director Adorno. During this meeting, she proposed hiring an independent behavioral health consulting firm to address issues that persisted despite her sounding the alarm.

64. Plaintiff emphasized that corporate and Artemis' standard business practices are often unsuitable and inappropriate in the mental health field, as it was clear Artemis was influencing and/or controlling Mountainside's operations and practices. Director Matteini responded by stating he would only consider the idea if Plaintiff personally researched and identified a suitable consulting company. Artemis Director Adorno stated that they preferred this kind of analysis to be

in-house. However, it was Director Matteini's and Mountainside's duty to remedy ethical and patient care concerns, not Plaintiff's.

65. That same month, a Recovery Coach, Zachary Cohn ("Recovery Coach Cohn"), shared with Plaintiff that his bonus depends on "quotas" connected to Key Performance Indicators ("KPIs"), including getting patients to admit to Detox and Residential Treatment, directly linking financially sound incentives to patient referrals. When Plaintiff was informed of this practice, she reasonably believed that Mountainside engaged in illegal kickbacks, made medical decisions based on profit, demonstrating that clinical care was disregarded.

66. In late August 2024, after Plaintiff complained to HR Killawee and subsequent to her meeting with Human Resources and Director Matteini, Mountainside promoted Tessa Candiotti, hereinafter ("Supervisor Candiotti) to a supervisory role for the clinical staff of the NYC Outpatient center without changing her official title. During this time, Plaintiff complained and reiterated the following to Supervisor Candiotti:

A) Security and Safety Risks: Ongoing concerns about the absence of proper security measures and cameras which posed safety risks to both staff and patients, including but not limited to OASAS requirement of maintaining secure patient records from public access.

B) Admissions Practices and Patient Screening: Patients were being admitted based on their financial situations and work schedules rather than their appropriate level of care, with admissions employees, who did not have the authority to make clinical decisions, negotiating treatment plans with patients rather than deferring to the Clinician who would be completing the patient's intake assessment.

C) Mandatory Referral Instruction: Directives to refer patients exclusively to Union Square Practice, a practice that purported to be the "preferred provider of the MLB" with "high profile celebrity patients" yet there were no providers within the practice who specialized in substance use disorder treatment.

D) Virtual Intakes and Incomplete Documentation: Virtual intakes often resulted in patients beginning services without signing consent forms, delays in conducting drug toxicology screenings, and payment agreements going unsigned for weeks after services had started.

E) Medication verification gaps: Patients were being admitted and starting treatment without verification of prescription from licensed psychiatric providers, including controlled substances, making it difficult to determine whether lab results reflected prescribed medication use or unauthorized substance use.

F) Concerns about Recovery Coaches: Referrals and client care decisions being financially incentivized, a practice which Plaintiff believed to be illegal.

67. Yet again, Plaintiff's repeated complaints fell on deaf ears and were not addressed.

68. Notably, even after Plaintiff's HR complaint, Supervisor Gottlieb remained the highest-ranking local leader of the NYC Outpatient and was entrusted with expanded managerial responsibilities, including oversight of Supervisor Candiotti.

69. In the summer of 2024, Dina La Fonte, a Mountainside Recovery Coach ("Recovery Coach La Fonte") who had business development responsibilities, arranged a meeting with Plaintiff's patient attempting to establish a referral relationship between Mountainside and the patient's personal business.

70. During the meeting, the patient disclosed that they were a current Mountainside patient and that Plaintiff was their treating Clinician. However, despite learning this information, La Fonte did not discontinue discussions regarding the referral relationship based on ethical or legal concerns. Instead, she stated she did not see an issue and encouraged the patient to pursue the business relationship while still being treated at Mountainside.

71. The patient subsequently reported the interaction to Plaintiff, who advised the patient against entering into such a relationship while in treatment due to ethical and professional concerns.

72. Immediately, Plaintiff reported the incident to Supervisor Candiotti.

73. This conduct created a clear conflict of interest and exposed both the patient and the facility to substantial legal risk. Plaintiff reasonably believed that by attempting to direct patients to a provider currently in treatment, Mountainside may have engaged in conduct constituting patient brokering or violations of state anti-kickback statutes. These actions also posed a significant risk of compromised care and exploitation of a vulnerable patient.

74. Specifically, in the summer of 2024, Plaintiff also became aware that Recovery Coaches La Fonte and Cohn, conducted a formal intervention with a patient and their family, which did not result in the patient transitioning to Detox and Residential Treatment. Recovery Coach Cohn stated to Plaintiff that he was disappointed that the intervention failed, as his bonus depended on "quotas" tied to admissions to Detox and Residential Treatment.

75. Plaintiff reasonably believed this "quota" structure constituted an illegal kickback arrangement. Recovery Coach Cohn explained that selling ancillary services and getting someone to Detox/Residential Treatment were KPIs that factored into bonuses. Recovery Coach Cohn also expressed his concern that Recovery Coach La Fonte did not have clinical credentials, training, or

expertise in facilitating a formal family intervention.

76. Further, a few weeks later, Recovery Coach La Fonte presented a list of new ancillary services during a team meeting, including leading interventions, despite lacking the requisite training, experience, credentials, or supervision to do so. Nevertheless, these services were billed to patients on an out-of-pocket basis. Accordingly, Plaintiff reasonably believed Mountainside permitted and benefited from the regular performance and billing of clinical services by an untrained and unlicensed individual, constituting improper and potentially fraudulent billing practices.

77. This demonstrates that Mountainside's bonus structure incentivized a particular form of treatment by Recovery Coaches, which Plaintiff believed to be illegal kickbacks in violation of applicable healthcare and anti-kickback laws.

78. On September 4, 2024, HR Killawee communicated to Plaintiff that her purported investigation regarding Supervisor Gottlieb had concluded. However, HR Killawee refused to disclose any findings or outcome, stating only that Plaintiff would "not receive any retaliation" and encouraging her to consider that "people can change." When Plaintiff informed HR Killawee that Supervisor Candiotti had since become her direct supervisor, she claimed she was not aware of that change.

79. On or around September 2024, Mountainside leadership directed Supervisor Gottlieb and Supervisor Candiotti to tell staff to discharge patients who were stable and only refer them to "Union Square Practice." After they gave this direction in a team meeting, Plaintiff asked for a reason behind the directive, to which Supervisor Gottlieb stated that he did not know.

80. Despite the direction from leadership, Union Square Practice did not have providers who specialized in substance use disorders. Notably, Union Square Practice was not qualified to treat

these patients, as a provider from Union Square Practice confirmed to Plaintiff that there were no psychotherapists or psychiatric providers at Union Square Practice that specialized in substance use disorders.

81. The new directive gave the impression that referrals were being influenced by business development interests or relationships with providers who treat celebrities and professional athletes. Referrals, however, must be made based on which providers can best meet the patient's clinical needs, not on marketing or financial considerations.

82. On September 20, 2024, Mountainside hosted an all-staff development day. During the "Security Hour" session, Plaintiff lodged a complaint about the lack of security at NYC Outpatient, which led to a one-on-one meeting with Brian (last name unknown), Head of Security for Mountainside ("Brian").

83. Brian was surprised to learn that the NYC location had no security presence and that the door to the OASAS clinical unit, which was required by OASAS to be locked, did not have a working lock and was constantly propped open. Brian assured Plaintiff that he would address the security issues. However, she never received any follow-up communication from him or anyone else at Mountainside regarding her concerns.

84. The following month, during a weekly team meeting, Group Leader, Kristina (last name unknown) ("Kristina"), reported that an incident had occurred during an evening group session involving a patient who was exhibiting clear signs of stimulant intoxication and behaving erratically, with no on-site security present or cameras.

85. Instead of addressing the reported security concerns, Supervisor Gottlieb stated that Kristina should have directed the patient to leave the group, effectively dismissing the security issue and directing a response that Plaintiff believed would place staff and all group members at risk.

86. Plaintiff grew increasingly concerned about the safety of both staff and other patients as the situation created a high-risk environment that could have led to physical harm or triggered relapses among participants. Plaintiff's patient, who attended this group session, voiced concern about being in the presence of another patient who was intoxicated and described this experience as highly triggering for relapse. Additionally, the patient expressed frustration over the inconsistency in level of care treatment decisions and policies for substance use while in IOP treatment.

87. Additionally, Mountainside's intake process failed to require disclosure or verification of prescribed controlled substances before admission. This omission poses a significant and unacceptable risk of relapses and/or harm to self, other patients, and staff.

88. In October 2024, Plaintiff was communicating with a patient who had entered treatment without providing documentation from their prescribing physician of the controlled and uncontrolled medications that they were currently taking. As a result, it appeared as if this patient was in active substance use even though they were not.

89. Due to this systemic failure, the patient began treatment without Mountainside having confirmed the patient's prescribed medications. When Plaintiff appropriately sought clarification to ensure safe and compliant care, the patient voiced anger towards Plaintiff because they believed they were being accused of active substance use.

90. The patient later provided photographs of the patient's prescription bottles to verify that the medication prescriptions were legitimate.

91. This incident demonstrates a dangerous gap in the institution's intake procedures, which not only jeopardizes patient safety but also exposes staff to unnecessary conflict, undermining the credibility of the treatment process.

92. Immediately following this incident, Plaintiff, while reviewing an admission note for an upcoming intake, discovered that the IOP program length had been reduced to four weeks for this new patient, which was inconsistent with the mandated 8-week IOP program and constituted a deviation from proper standards of care.

93. On October 21, 2024, as a result of constant improper treatment, Plaintiff emailed Supervisor Candiotti and Supervisor Gottlieb, reiterating concerns she had previously raised on multiple occasions regarding improper admission practices, including a lack of proper assessment in determining levels of care. She further reported that patients were being admitted without documentation of their current prescriptions and that IOP lengths were being modified without clinical justification. Plaintiff again emphasized her reasonable belief that Mountainside\Artemis prioritized admissions and revenue over the clinical need, compromising patient care and the law.

94. On October 22, 2024, Plaintiff complained to Adriana Pope ("Pope"), Assistant to Artemis, regarding ongoing security issues and improper admissions practices, specifically highlighting that patients were being placed in inappropriate levels of care. She also expressed concerns about the incentivization of Recovery Coaches, who were being rewarded with year-end bonuses tied to treatment admission and other KPI's.

95. Plaintiff further pointed out that she believed Recovery Coaches were being incentivized to admit patients to Detox and/or Residential Treatment at Mountainside in exchange for kickbacks.

96. Mountainside further encouraged this behavior in the all-staff quarterly meetings by celebrating the departments based on the number of patients admitted to Detox and Residential Treatment. Other celebrations included a “Best in Class” dinner, during which select Recovery Coaches were recognized with this status based on the amount of revenue they generated, rather than Mountainside’s statement that “Best in Class” selections were based on employee voting.

97. Plaintiff also indicated that she had previously reported these concerns to HR and had emailed Supervisor Candiotti and Supervisor Gottlieb with her complaints the day before. Pope agreed that these issues were serious and that she was particularly surprised to learn that the Admissions Department was telling patients they could complete only 4 out of the required 8 weeks of the IOP, undermining proper treatment protocols.

98. Due to Mountainside’s inaction, Plaintiff, immediately following her discussion with Pope, requested another meeting with HR Killawee via email to reiterate her concerns and escalate her complaints.

99. However, just **mere** hours after Ms. Goswick complained to Pope and requested a meeting with HR Killawee, and a day after her written complaint to her supervisors, Mountainside, by way of CEO Basso and HR Killawee, in an abrupt fashion **terminated** Plaintiff’s employment for reaching out to Human Resources and complaining to Pope (as CEO Basso claimed she was not the “appropriate channel”), in direct retaliation for her whistleblower complaints. It was evident that Pope escalated Plaintiff’s complaints immediately to CEO Basso, who, instead of remedying the issues, took retaliatory action against her.

100. Rather than investigating Plaintiff's legitimate concerns and good-faith complaints, Mountainside terminated her employment and prevented her from properly closing out care with her patients, many of whom were in the midst of trauma recovery through Eye Movement Desensitization and Reprocessing (EMDR) therapy.

101. EMDR is a psychotherapy that assists individuals in processing traumatic memories by recalling distressing events while engaging in bilateral stimulation, such as eye movements, sounds, or taps. Abruptly ending such treatment without appropriate clinical closure places patients at significant risk of traumatization and relapse.

102. To avoid scrutiny of its illegal and unethical conduct, Mountainside actively stymied Plaintiff's efforts to voice her complaints of, inter alia, patient care practices and ultimately retaliated against her by summarily firing her.

103. Plaintiff engaged in protected activity by reporting in good faith and with a reasonable belief violations of law, rule, and regulation, as well as substantial and specific dangers to patient safety and public health, including falsification of records, improper admissions practices, clinically unsupported levels of care, and illegal kickback and KPI driven incentives impacting treatment decisions.

104. Despite Plaintiff's repeated internal complaints, Defendants failed to take corrective action and instead retaliated against Plaintiff because of her protected activity, causing her emotional distress and other damages.

105. Plaintiff has suffered and will continue to suffer substantial economic and non-economic damages, including lost income, benefits, career advancement opportunities, professional standing, emotional pain and suffering, and other harms compensable under applicable laws.

**FIRST CAUSE OF ACTION**
**Retaliation in Violation of the NYLL §§ 740(2)[a] & [c]**

106. Plaintiff repeats and realleges each allegation set forth above.

107. Defendant Mountainside unlawfully retaliated against Plaintiff by terminating her employment for having lodged protected complaints for what she reasonably believed was illegal activity in violation of the New York Labor Law as amended, §§ 740 (2)(a) and New York Labor Law, as amended, §§ 740 (2)(c) ("NYLL").

108. This cause of action is timely pursuant to NYLL § 740(4)(a).

109. Plaintiff properly asserts her existing rights pursuant to NYLL § 740(7).

110. Defendant Mountainside willfully engaged in discriminatory practices with malice and/or reckless indifference to Plaintiff's rights.

111. Plaintiff is entitled to injunctive relief, reinstatement, compensatory damages, economic damages, a civil penalty of an amount not to exceed $10,000, punitive damages, and attorney's fees and costs.

**SECOND CAUSE OF ACTION**
**Retaliation in Violation of the NYLL §§ 741(2)[a] & [b]**

112. Plaintiff repeats and realleges each allegation set forth above.

113. Defendant Mountainside unlawfully retaliated against Plaintiff by terminating her employment for having lodged protected complaints for what she reasonably believed was improper quality of patient care and objecting to participate in violation of the New York Labor Law as amended, §§ 740 (2)(a) and New York Labor Law, as amended, §§ 741 (2)(b) ("NYLL").

114. This cause of action is timely pursuant to NYLL § 741(4)(a).

115. Plaintiff properly asserts her existing rights pursuant to NYLL § 740(7). Defendant Mountainside willfully engaged in discriminatory practices with malice and/or reckless indifference to Plaintiff 's rights.

116. Plaintiff is entitled to injunctive relief, reinstatement, compensatory damages, economic damages, a civil penalty of an amount not to exceed $10,000, punitive damages, and attorney's fees and costs.

**THIRD CAUSE OF ACTION**
**Violation of Mental Hygiene Law - MHY § 32.06**

117. Plaintiff repeats and realleges each allegation set forth above.

118. Defendant Mountainside is a provider under MHY § 32.06 (1).

119. MHY § 32.06 (2) provides in relevant part that no provider shall intentionally solicit, receive, accept or agree to receive or accept any payment, benefit or other consideration in any form to the extent such payment, benefit or other consideration is given for the referral of a person as a potential patient for substance use disorder services or as a resident at a certified recovery residence.

120. MHY § 32.06 (3) provides in relevant part that "No provider providing or purporting to provide substance use disorder services or operating or purporting to operate a certified recovery residence pursuant to this chapter, shall intentionally make, offer, give, or agree to make, offer, or give any payment, benefit or other consideration in any form to the extent such payment, benefit or other consideration is given for the referral of a person as a potential patient for substance use disorder services."

121. Defendant Mountainside violated the herein sections as set forth herein.

122. Defendant is civilly liable for violating MHY § 32.06 of New York Mental Hygiene Law.

**FOURTH CAUSE OF ACTION**
**Violation of Public Policy under New York Education Law § 6530 (19)**

123. Plaintiff repeats and realleges each allegation set forth.

124. At all relevant times, Plaintiff was employed by Defendant Mountainside as a Clinician within a facility engaged in the treatment of individuals with substance use disorders.

125. During the course of Plaintiff's employment, Defendant Mountainside established and implemented an incentive compensation structure in which bonuses were evaluated in whole on the number of patients referred to Defendant Mountainside's Detox/residential program.

126. Plaintiff raised good-faith objections to the referral-based KPI structure on the grounds that it violated professional ethical obligations and constituted unlawful referral practices, including but not limited to violations of New York Education Law § 6530 (19), which prohibits licensed professionals from offering, soliciting, or receiving any fee or consideration in exchange for patient referrals.

127. Plaintiff was subjected to adverse employment actions, including but not limited to her termination, as a direct and proximate result of objecting to these unlawful referral practices.

128. Defendant Mountainside's actions were in violation of the public policy of the State of New York, which seeks to ensure that licensed professionals make clinical decisions in the best interests of patients, free from financial and institutional pressure, and that they refrain from engaging in unethical or illegal referral arrangements.

129. As a result of Defendant Mountainside's unlawful conduct, Plaintiff has suffered and continues to suffer damages including but not limited to lost wages, reputational harm, and emotional distress.

130. Defendant Mountainside violated the herein sections as set forth herein.

131. Defendant is civilly liable for violating Public Policy under New York Education Law § 6530 (19)

**DEMAND FOR RELIEF**

132. WHEREFORE, it is respectfully requested that the Court enter judgment in favor of Plaintiff against Defendant, in amounts to be determined by the finder of fact, on the Cause of Action, awarding emotional distress, damages, compensatory damages, economic damages, punitive damages, attorney's fees, and costs, and granting such other relief as may be just.

133. Pursuant to New York Labor Law, as amended, §§ 740 and 741 ("NYLL"), New York Mental Hygiene Law § 32.06 ("MHL"), and New York Education Law § 6530 (19), Plaintiff demands a trial by jury.

Dated: October 22, 2026
New York, New York

Respectfully submitted,

/s/

Jacqueline Carranza, Esq.
Keyonte Sutherland, Esq.
Elefterakis, Elefterakis & Panek
80 Pine Street, 38th Floor
New York, NY 10005
jcarranza@eeplaw.com
ksutherland@eeplaw.com

*Attorneys for Plaintiff*